I'm Lisa Tavani, Deputy Attorney General here for Defendant Fisher. The parts that they asked me to take a second and explain to you become strange. Everything about this case is strange. Everything is strange. Including the fact that someone's alleging that there's such a good thing as good kosher wine. I find that horrendously strange. The reason that we've made this arrangement is because although the intervener appellees were in the step two of the briefing process and are considered appellees, they're really in a different class and are more aligned, although not entirely aligned, with the state. And so we've agreed with the plaintiffs to share the time in that way. It's my understanding also from the order that I'll have three minutes for a bottle. Okay. That's not a minute. Okay. Your Honors, this is a manufactured case filed against New Jersey's winery laws as an attempt to overrule the voice of the New Jersey legislature through litigation. Well, it clearly is, but where does that get you? I mean, if they're right on the law, what difference does it make that they're manufacturing litigation to try to get it so that folks can have wine directly shipped to them? Well, Your Honor, if you take a look at, and I don't want to step on my colleague who's going to focus on standing, but if you look at even just the standing aspect of the case, the fact that these plaintiffs really had very limited claims and the judge and the record didn't reflect the magnitude of what was going on. Because of that, you can't really figure out what the case is about. And what I'm talking about is the wine. We can determine that only large people with large interests can come to court? Well, you have to have interests, Your Honor, that fall under the standing requirements. You have to have a real interest, an injury in fact. You have to prove regressibility and causation and all those things. Well, the Freedmen's may be a bit of a tougher call, but if the Freedmen's are alleging that they're wine connoisseurs and they cannot get the boutique vineyards to send in wine, the wine from those boutique vineyards, they can't get that because of the direct shipping restriction, the problem is the 2004 amendment. But that means they lose on the merits, doesn't it? That doesn't mean they don't have standing to raise the claim.  But Judge Hayden quoted that pithy saying from the Breidenbach case about whether if you've got a bottle of fancy wine in one hand and a corkscrew in the other, you've got a palpable injury. It was a broken corkscrew and you do have a palpable injury. Depends on how much you paid for your wine. But the inability to get wine is really absent some statutory discrimination. It doesn't express a cognizable right. I mean, states can prohibit the sale of all wine, pursuant to their responsibilities under the 21st Amendment. We're talking about discrimination, right? That's the issue. And what about the $25 fee? Isn't that a personal accompaniment fee? Isn't that discriminatory when we compare in-state versus out-of-state sellers? Well, Your Honor, as Judge Hayden said in her opinion, there may be some difference between the rights of an in-state or an out-of-state with regard to personal accompaniment. But if you use the Pike Tax to take a look at those and you see the state's interest in preventing illegal activity, and what we mean is somebody bringing in a large amount of wine from out-of-state, what the state would like to make sure is that they're not somehow illegally selling it, that it's actually for personal use, hence the personal accompaniment definition. And based on her weighing of those rights on the Pike Tax, she found that the personal accompaniment section of the statute was not discriminatory. So you can sell wine you get from Jersey, but you can't sell wine that you're bringing in from outside of New Jersey. We sell it. Well, perhaps there's not enough market for New Jersey wine. It's really an issue. That's very possible. One thing that troubled me, and I didn't see it that focused on, and you can agree, but the licensing, I think it's the farm license, that ties the licensing requirement to using New Jersey grapes. And I'm surprised that's not more of a centerpiece of litigation. Why wouldn't that be a problem? How can you tie a licensing requirement to someone using your own grapes? I mean 25 percent, I guess, have to be Jersey grapes for the farm license. I think 51 percent have to be New Jersey fruit. In a plenary winery license, both licenses require land in the state of New Jersey. And no one's really focusing on that. The Jersey land might be a bit different. I'm not sure it is, but why isn't that a problem? Even under Granholm, why isn't that under the scheme? Well, Your Honor, Granholm didn't say that we disavow the 21st Amendment. And if you look at the 21st Amendment, it gives inherent rights to the state to license. But not on a discriminatory basis under the Commerce Clause. You have to license in an even-handed matter. It doesn't mean that you can't make distinctions, which you do between, say, a limited wholesaler license and a plenary license and a farm license. Those kinds of distinctions may well be valid. But the distinction cannot be based on forcing people to use New Jersey grapes or giving an advantage in the licensing process to someone because they use New Jersey grapes. Well, Your Honor, there are two different kinds of New Jersey licenses. There's a plenary license, and there's the farm winery license. I know that you seem to be focusing on the requirement of New Jersey grapes or fruit being used in that one. But there's also that other license out there, too. So there are parallel licenses so that there's not only a requirement that you use New Jersey grapes to receive one of these licenses. But the farm license, as I read it, allows you to ship directly. Isn't that a problem? Absolutely not, Your Honor. I thought they can deliver in their own vehicles. No. That was a mischaracterization in the briefs of the plaintiffs that is absolutely not true based on New Jersey law. And you'll see from the evidence provided that not only in Director Fisher's testimony, but if you look at the actual language of the 2004 amendment, you'll see that what it does is it takes away the delivery rights of both New Jersey licenses. And also in 2005, when the re-adoption of the New Jersey alcohol beverage control regulations occurred, that was also changed in the regulation. So there's absolutely no right for any winery, either farm or plenary, to ship or deliver to consumers. Excuse me. Go ahead. The only delivery allowed is from the farm or plenary winery itself to outlets. Okay. It struck me, maybe this is a simple-minded view of mine, but that there's a fairly significant difference between the privileges that you get under a plenary or farm winery license and those that you get if you're not qualified, namely out-of-state producers. You get whatever else you get under those winery licenses. You get the opportunity to set up six sales rooms. That's not available, is it, to an out-of-state? Well, obviously not, Your Honor, because what that is, is it's actually a subsection of what we call face-to-face sales on the winery. So a winery itself is permitted, pursuant to New Jersey law, to sell only in face-to-face, on-premises transactions to New Jersey consumers. You can get up to six sales rooms that are away from the winery premises, though, can't you, if you're a New Jersey winery? Yes, that's right. They're off-premises, but you call them on-premises. Well, they're considered licensed as a winery premises. But they're not. They're miles away from the winery. That seems to be a transparent gimmick, isn't it? I mean, how do you call a point of sale that's miles from the winery on-premises? It renders the word premises devoid of all meaning. Well, they're licensed in the same way that a winery itself would be licensed. Someone from the state comes out and checks all of the same criteria. It's not on-premises. It's far away. It could be far away. It may be right next door. But it could be the opposite end of the state. I mean, the whole point isn't to put six storerooms on the curtilage of the winery. It's to spread the six storerooms in the locations, presumably, where the highest population of wine drinkers exist, right? Well, I guess the purpose is to allow the wineries to have face-to-face sales in a bigger area than they would if they had a winery and it was only on the winery. And they can sell to consumers there, is that right? They can sell in face-to-face sales to consumers. If you have a limited wholesale license, can you do that? I'm sorry, your Honor? If you have, let's say, a winery in California, Stag Leap, which I love. Say Stag Leap wants to sell wine in New Jersey. So they want to set up some showrooms in New Jersey. So they rent space and they find six locations, say, in an industrial park somewhere. No zoning problem. And they set them up as their own showrooms. And they're going to ship from California into those showrooms and set up to sell directly to consumers. They can't do that because they have to sell for wholesales. Well, or they can sell to retail themselves, but they can't set up a retail showroom in that same way. Why isn't that discriminatory? Well, because the whole purpose of licensing under the 21st Amendment is to allow the state to have local control over face-to-face sales. You keep coming back to the 21st Amendment. That's our favorite. That's a good amendment. It's fine. It's not just there to keep 20 and 22 from colliding. It's fine. But this is also this thing called the Dormant Commerce Clause, which says that whatever you do under the 21st Amendment, you have to be evenhanded. You can't favor New Jersey wineries by allowing them six showrooms and tell the folks in Napa or Sonoma Valley or anyplace else, you cannot set up any showrooms in New Jersey because you have to sell to a wholesaler. If I have to sell to a wholesaler, I can't set up a showroom and sell to a consumer. Now, maybe I don't want to, but if I did want to, because of the licensing structure there and this three-tier system, which I am forced into if I'm out of state and not forced into if I'm in state, why don't you have discrimination? Illegal discrimination. Well, Your Honor, I feel as though we're focusing on the sales rooms and not looking at the big picture, which is the face-to-face on-premises sales. I mean, if there weren't six sales rooms. How do I get face-to-face on-premises sales if I'm out of state, unless I do a showroom? On your own winery premises. So someone has to go from, say, Newark to Sonoma Valley to see and buy my wine directly from me. In other words, if my winery is in the Pine Barrens and I'm doing whatever I can do to whatever goes in the Pine Barrens to manufacture something that I can call wine, I can set up six showrooms and sell directly to consumers. Do you see the problem? Well, I understand that that's the geographic difference between being in California, being in Pennsylvania, or being in New Jersey. Right, not exactly, because a New York winery might be more proximate to a storeroom in North Jersey than a South Jersey winery. You could have a New York winery that's 10 miles away from one of these premises. You could be calling on-premises a New Jersey storeroom that's 100 miles from the New Jersey vineyard that's only 10 miles from a New York vineyard. And the New York vineyard can't sell in that on-premises storeroom. It can't even create the on-premises storeroom. It has to go through the additional middleman, which causes it to increase the cost of its wine. Well, but in the converse, I mean, a New Jersey consumer who lives... Isn't that true? Well, it's true that in geographical differences, a New Jersey resident who lives right on the border of New York would be closer to a New York winery. But then they could take advantage of the face-to-face sales, and they're not even constrained by the problem or practical effect that the plaintiffs are talking about, and that is the fact that you can't travel to California for a face-to-face sale. You can travel to New York if it's only 10 miles away, and it's just exactly the same as if you travel to a New Jersey winery. Only face-to-face sales, no shipping, no delivery. When the New Jersey resident travels to the New York vineyard, they have to get the $25 permit. Only if they're bringing in a larger amount of wine, and for the reasons that we just talked about a little while ago on the personal accompaniment with requirements so that the state of New Jersey knows what's going on. And that is really not a violation of the Commerce Clause or in any way actionable discrimination. Was there any demonstration? I didn't see any, but maybe I missed something. Any demonstration on the record that the special fee for bringing in wine from elsewhere was a necessary device or the only device for ensuring whatever New Jersey's interests were? I know the district court spoke about protecting New Jersey's taxing authority, but what the connection was I frankly didn't see. Well, I think the evidence that was discussed by the judge is really the evidence that was presented, and that is not only the taxing component, but also the prevention of illegal activity in bringing in the wine and selling it without a license. No other way except to offend the Commerce Clause? Well, that's if you think it does offend the Commerce Clause, which we believe it does not because it's a very... Well, let's not say offend the Commerce Clause, to introduce differential treatment of in-state and out-of-state wine. Compared to the 21st Amendment. It hasn't been something that's been offensive to some of the other courts. In fact, you probably saw that the Fifth Circuit just affirmed the law in the state of Texas, which also had a personal accompaniment limitation. But Texas is a separate republic. It really is. But they also have 21st Amendment rights, like everyone else in our country. I see that my time is up. Let me just ask, and I'm not sure I've gotten this from you, what is the legitimate interest New Jersey has in precluding, and I keep coming back to California, although Judge Hardiman's example of the New York winery is a better example. What is the legitimate interest New Jersey has in precluding a California vineyard from setting up sales rooms in New Jersey and selling directly to consumers? Well, Your Honor, the reality of regulating a New Jersey winery is different than regulating a California winery. You don't care about regulating the winery. You just want to care about regulating what they do in their estate, which you can do because they're there. You can inspect the showrooms. You can make sure whatever is sold is consistent with whatever licensing requirement they have. You don't care what they're doing in California. You can regulate them in New Jersey as well as you can regulate the in-state showrooms, can't you? I thought you were going to say it's an affront to the three-tier system and you value the three-tier system like many other states. We love the three-tier system. The problem is allowing in-state wineries to have six on-premises showrooms doesn't seem to be honoring the three-tier system. Well, Your Honor, I know we all seem to be stuck on the fact that you can move these around, but if you had a large winery, you could have the same space for sales face-to-face as if you had a couple little small winery outlets around the state. I don't think the amount of sales are different. We keep coming back to the problem is the face-to-face sale, which the California folks may want to get. I'm not sure on this record they're standing for it, but if they wanted to do it, they couldn't do it. Well, Your Honor, you're right, and you brought the point that I was going to make next is that on this record, we really don't know if anyone wants to come into the state of New Jersey. As you can see from Director Fischer's affidavit, not one out-of-state winery has ever asked for these outlets, ever. They may say something about New Jersey. You can't get them. It's a three-tier state. Well, but there hasn't been any interest in getting them anyway. How could they get them? That's a good point. If they ask for something and they look at New Jersey's licensing, they're not going to get it. If they did express, if some out-of-state winery did express an interest in coming into New Jersey, then would it be your position that they would be authorized to do so without being subject to these differential ratings? I don't believe that New Jersey law would allow that right now based on the winery statutes. All right. Thank you very much. All right. Thank you. That's our fault, not yours. And I guess, Mr. Lewin, you're not first on paper, but it's my understanding from this sheet you're going to do standing, for which you're only giving yourself three minutes. I'll take as many minutes as the court will allow. My guess is you might have a few more than three minutes. Help me understand how either the Freedmans or the Freemans or the winery, which is begging and screaming and clawing to get out of this lawsuit, how can you get standing? Well, Your Honor, our position is they don't have standing. We're their intervener defendants. We actually moved the district court to dismiss the plaintiff's complaint on the basis of standing, and Judge Hayden tried to limit it. That's right. So I don't need three minutes. I'm sitting down. Okay. But this is the most unusual case, and the unusual nature of it goes right into the standing issue, which, as Your Honor noted earlier, is a threshold issue. For one, we have Hansel, which, as Your Honor mentioned, wanted to get out of the case. Testify. He does not care who wins or who loses. Now, there may be some lines. Why did he get into it? I mean, he's here and wants to get out. Why did he get into it if he didn't want to? Well, you'll have to ask the plaintiff's counsel, but I would go to Ms. Devani's comment that this is a manufactured lawsuit where the plaintiff's counsel had to hunt for plaintiffs and couldn't necessarily get the plaintiff that had standing. And that's where the manufactured nature comes into play because they don't have standing. Some other winery plaintiff might, but he doesn't. Even to set up a salesroom, he testified specifically on the record he had no interest in setting up a salesroom. Some other winery who isn't before the court might, he didn't. And then we have to go to the Freedman's and the Freedman's. And there is no question in the world that they don't have standing on the non-direct shipping issues, including the salesroom. The Freedman's don't want to travel other than to the local shop, right? They're not interested in go visiting a salesroom. And the Freedman's are interested in allocated, hard-to-find, rare wines. Where is the proof in this record? Where is the hint in this record that those sorts of wineries want to set up an establishment in New Jersey where they can make face-to-face retail sales to consumers? There's none, and in fact, the Freedman's testified through their certifications that most of these wineries don't even sell on their own premise on the West Coast. If they don't want to set up a salesroom on their own winery premise, why are we to assume, how is a district court to find that they have standing, that the Freedman's have standing to challenge the salesroom provision here? What about the personal accompaniment provision? Don't the Freedman's want to go to West Coast Vineyards and order wines that are shipped into their home? The Freedman's do want to. They don't want to ship. I mean, they want to bring it back, which is actually shipping because of the post-9-11 rules, which allow you to hire a carrier to send it. Right, but it's treated as personal accompaniment. Because you have to be in face-to-face at the vineyard to order it. Well, you have to be the shipper and the shippee. Okay. But why doesn't that $25 fee cause them trouble? When they're going on a one-week tour of the Napa Valley, they can't be sure, based on their tastings, which cases they want to order, et cetera. How can they even feasibly apply for the $25 fee before they go on premises out on the West Coast? There's no testimony of the kind you just said, Your Honor. There's no testimony they've had any problems. In fact, the testimony, which is found at JA-113, says they've never had any problem bringing wine back into New Jersey. So this challenge to this personal accompaniment impediment has been no impediment for this couple. So you can see that, in theory, it could be a problem, but here, as applied, they haven't marshaled anything to indicate it's been problematic for them. Given the record, there certainly isn't any testimony that anybody would have a reasonable fear of that personal accompaniment fee being a barrier to them bringing wine back into the state. And so we really come down to do the consumer plaintiffs have an interest in bringing the direct shipping portion of this lawsuit. And they do say that they want to sit and click on the Internet and order wines remotely from West Coast vineyards and have them shipped via UPS, FedEx, whatever, into their homes, which states an injury in fact, but that's not enough. You have to get to the second and third prongs of standing analysis, which is that that injury must be fairly traceable to the conduct of challenge, and it must be regressible. And it doesn't meet either of those requirements in this case because what these consumer plaintiffs are challenging is a preference. And in the case of the freedmen... But now there's no direct shipping for anyone. And there's no competitor in New Jersey. That goes to the merits, though. That's not standing. It's not regressible because you say they lose on the merits. I mean, that's conflating standing with the merits, is it not? Well, you cannot go into the merits on standing, but the standing analysis, as Worthy Selden says, has to look at the nature and source of the right at issue and compare that to the injury asserted and see if the injury asserted turns on the challenge conduct. And it's very hard to do that here when you look at the plaintiff's claim and it's a preference for a local market, and there is no preference you can identify, and there is no local market you can identify. Look at the freedmen. They want kosher wines. There are no New Jersey kosher wines. There not only are no good New Jersey kosher wines, there are no New Jersey wines. I thought the Queen Anne Winery offers 200 kosher wines. What if? I thought that the Queen Anne Winery offers 200 kosher wines. It goes from winery to winery to winery. It goes eight miles from the freedman's home. Maybe that's not in the record. That's not in the record, and that wasn't in my knowledge base, Your Honor. You don't spend as much time ferreting out wine as they do. And kosher wine. And bad kosher wine. And the freemans are no better situated on this because there's no marketplace. There's no market preference, again, because there is no preference. It's an even-handed statute. And they're seeking these hard-to-find allocated wines, and there's no New Jersey market competitor in that realm. So how do you do an analysis, which is essential, the Supreme Court tells us, of the traceability concept when you want to compare their injury to their theory and there is no preference and there is no market? And it does sound a little bit like you're getting towards the merits, but that's not unusual for a standing analysis to start to not reach the merits but to do an analysis that sort of echoes the merits. And the addressability issue is the same. This isn't a case like Granholm where the court could remedy the situation by either nullifying the local preference that was granted to the in-state wine producer or extending the challenged rights to an out-of-state. Here there is no wall at the New Jersey border as far as direct shipping. There is just no right. And so what the plaintiffs are asking this court to do is to build a bridge because the West Coast wineries can't effectively get to the New Jersey marketplace. They're asking this court to build a bridge or an expressway that allows those wines to make it to the New Jersey consumer. Now, Mr. Lewin, this isn't a standing question, I guess. Help me to get a sense of the structure. Your client's interest in this litigation is what? We are one of the all three wholesalers, the three largest wholesalers in the state, moved to intervene and were granted intervention rights because what this posits is you can zip right past the wholesaler. You can have all these out-of-state wineries, small, big, doesn't matter, gallow, could under the plaintiff's theory sell directly to New Jersey consumers avoiding the three-tiered system. So that would be bad for business? Well, that's the economic interest, and we think we're a big supporter like the state. It would equalize the playing field, wouldn't it not? It wouldn't equalize. Between whom, Your Honor? Between in-state and out-of-state interests? Here we have a marketplace where 99% of the wines sold in New Jersey come from out-of-state. It might equalize the playing field between people from out-of-state who are succeeding under the three-tiered system and those people from out-of-state who are failing to succeed under the three-tiered system. But it does not equal the playing field between local New Jersey wineries and out-of-state wineries. So, I mean, I don't know if that answers your question. I may have gone far afield. I apologize. But the myth of this case is that it's really a New Jersey preference case because this isn't a New Jersey preference case because the wines sold in this state aren't from New Jersey. But the case tries to pick a couple New Jersey preferences, most of which no one, no plaintiff has any care about, and say, aha, we have these small wineries, these exclusive wineries, who can't get their product on the shelves, and so they need another way to get into New Jersey, so you have to give direct shipping. But it's not because of a local preference. It's because that's the way the New Jersey system is set up, and it accommodates some out-of-state competitors better than others. Does the record show how many sales rooms your client has? My client would never – well, first of all, the sales rooms my client would be permitted to have would be one, and it would be a sales room where they could introduce product to retailers. They would not be allowed under the statute ever to make a sale to a consumer. And the answer to your question is I don't actually know if they have that sales room. I do know it would be at their wholesaler location, so when a retailer comes and says, you know, I'm trying to get you to buy 100 cases of this great wine from Napa Valley. Before I buy 100 cases of the wine, I want to taste it. And so at the showroom, you can open the wine. That was a mistake the district court made, apparently, in the nature of what the showrooms are. Right. And, you know, there was never oral argument before the district court, so there was never a chance to explain any confusions that she might have had on that issue. Thank you very much. Before you – how are we? I think – Miss, you're Miss Skagel? Skagel, okay. Because on the piece of paper, you're on one side, and the courtroom, you're on the other side. Okay. Yes, sir. I apologize for the mixed messages here. But let me say – On our end, our marketing, this is from Mr. Lewin's Pioneer Fedway. How? There are all three wholesalers in New Jersey separately owned, but same interest here, and all three were intervener defendants. Okay. But you want to address the merits? Yes, sir. Okay. Unless you have questions that you want me to address. But having said that, let me just, if I may, follow up on a couple of things that Your Honors inquired of my colleagues earlier. One of the inquiries was, can a California winery set up a sales room? The answer is no. Then the follow-up was, well, what's the alternative? The alternative, Your Honor, is to get a retail license. Remember, the three-tier system is set up so that manufacturer, wholesaler, retailer, under New Jersey law, cancel winery if it so chose. It doesn't seem like it wants to, but could get a retail license. Your Honors may recall that there was some discussion. What kind of retail license would it be? Is this called a retail license? Yes, sir. But then they have to go through your client, Mr. Lewin's client. They have to go through the wholesaler. If they have, if they set up here, Your Honor, so that they have their product coming in from California, that is correct. Well, then that advantages the Jersey wineries with their six on-slash-off-premises locations because they don't have to go through a wholesaler, correct? That is correct, Your Honor. However, that is only with respect to their own wine. If Mr. Hansel were to get a full retail license, he could sell anything. He could sell spirits. He could sell wine. That does go to my question, and I think it goes to the plaintiff's concern. If you're a California winery and you want to get your wine into the consumer's hands in New Jersey, you have to go through the three-tiered system, which you would not have to do if you happen to be a New Jersey winery. Am I missing something there? No, Your Honor. However, there are alternative licenses. If you want to go direct, in other words, skip all of the tiers and obviate the three-tiered system altogether, which keep in mind that this is not supposedly a challenge to the three-tiered system, then Your Honor is correct. That is not possible. But that is not possible for a New Jersey winery either. In other words, other than through the sales room, which requires— That's a huge other thing. Well, yes and no, Your Honor. Keep in mind, and Mr. Lewin commented on this, 99% of the wine that's sold in New Jersey comes from out-of-state. So you can't talk about this in a vacuum. In other words, there has to be a discrimination, and you have to have a discrimination as between two things, correct? So thing one is out-of-state wineries. What are they complaining about? Wholesaler bottleneck. Nobody pays attention to me. I don't want to have to do the increased advertising. I don't want to have to pay the markup, blah, blah, blah. Go on the other side. The instance— Ka-ching, ka-ching, ka-ching. Sorry. Well, but on the monetary issue, Your Honor, that in and of itself is not enough. Why? Because that is an effect of the three-tiered system itself, and the First Circuit in Valdeci was the most recent court to note that. That's why I asked my question. You're quite right. They can't complain about the increased middleman costs of the three-tiered system. But that's a different question, though, of a system that allows in-state wineries to bypass the middle step. And what if there's a small winery in Oregon somewhere that has really expensive wine and they can't move a lot of product? Presumably your wholesaler client and Mr. Lewins and the third aren't going to be real interested in investing a lot of time with this winery that might be moving small amounts of product. But that winery might have a vested interest in establishing one storefront on premises, let's call it, right in the heart of the highest net income area in New Jersey. But they can't do that. But that New Jersey winery can set up its on-premises store, bypassing the middleman right in the heart of that same town. That's correct, Your Honor. However, remember, and I don't want to sound like a broken record, but we're missing the... I'm not going to say blah, blah, blah. No, I'm not going to say blah, blah, blah or et cetera, et cetera. What I am going to say, however, is that what's the plaintiff's burden here? It's to show discriminatory effect or as... Didn't he just give you that? No, Your Honor, and this is the reason why. With respect to that small Oregon winery who apparently has wine to die for, they are not selling to my client. They're not selling to Mr. Lewin's client. No, they want to sell to the Freedman's. They want to sell directly to the Freedman's. That's correct. And their preferred business model, in other words, to skip the three-tier system, may in fact be the preferred... Well, they know they can't do that, though. The gig is up. And they know they can't, since you've made the amendment, they can't ship directly. But the next best alternative is to rent 1,500 square feet in a little strip center in the wealthiest town in New Jersey. Your Honor... And they can't do that, but the New Jersey Vineyard can do that. They can't do that because the zoning doesn't permit it. It's a dry town. And, Your Honor, again, on this record, Hansel Winery, who's the only winery plaintiff, so therefore the only plaintiff who can complain about this particular aspect, correct, has indicated no interest to do so. In fact, he doesn't have an interest to do so in his home state. No, that's a standing issue for Hansel. My question is more of a general question. Forget about Hansel. Yes, Your Honor. And let's assume for the moment that Your Honor is absolutely correct that on its face, poor choice of words, because, well, on this one, let's assume for the moment that is a facial discrimination. What is the effect of that, however? Because, remember, the plaintiff has to show disparate impact, to use a different phrase that folks may be more familiar with. More recently, the Baldacci Court said there has to be substantial evidence of discrimination as a result of the statute in question. What effects do we see? We see 99% of the wine in New Jersey that's sold comes from out of state. There clearly is no effect there. It doesn't help my little Oregon wine. It doesn't. And it might be that 99% of the wine in New Jersey comes from out of state because there are so few wineries in New Jersey and they're competing against all the wineries in California, in Oregon, in New York. Therefore, a lot more are going to come from out of state. So I'm not sure that really helps. Well, then let's look at it another way, another possible proof. How many wineries, by the way, are there in New Jersey? I'm sorry? How many wineries are there in New Jersey? I've forgotten, Your Honor. The ballpark figure. 5, 100, 20? 35. I was going to say 40. It sounds like it's, you know, less than 50. Your Honor, may I continue? I see the red light has gone on. Another way that the plaintiff could have established the effects that Judge Hardiman is, let's say, assuming exists would be to show that there has been a substitution. In other words, I can't get that Oregon wine that I really want, and therefore I am going to get a wine from Cape May. There is absolutely no proof on this record that that has happened once. The Freedmen's are the closest, and they say it's a clear, you know, we're on rough times and we're buying this stuff just to be polite when we go to visit. That's what their testimony said. So under the Exxon and under Hunt, which use this notion of is there a substitution, nonexistent. In fact, to the contrary, nobody looks at New Jersey wine as a valid substitute for the Oregon Pinot Noirs or the California Caps. It is what it is. But we have to get away from sort of the sexy sound bites of these cases and cocktail party conversation where I am not a popular person and focus on constitutional law. And the evidence is not here, Your Honors. And if I might, I just want to try to ground this in the case law so that it's not loosey-goosey all over the place. Everybody starts on the same page here, and that Brown-Forman seems to be the case that sets the two-tiered approach that people agree applies, people meaning the litigants here. And you have two choices, as Your Honors know. There's either strict scrutiny if the statute directly discriminates or if there is in effect discrimination. If not, you're in pike balancing. Keep in mind here, Your Honors, that the plaintiffs have put all their eggs in the strict scrutiny basket. They said, and it's in the joint pretrial order, that they are not offering proof on pike. So if they don't make the grade under strict scrutiny, then it's game, set, and match to use Judge Hardiman's turn in the prior oral argument here. So let's get our arms around, well, how do we know whether strict scrutiny applies? Because the plaintiffs are correct that that is a very important decision that the court needs to make. Looking at Brown-Forman, the court there said, the critical consideration is the overall effect of the statute on both local and interstate activity. If you're going where I think you're going, I'm surprised. Are you saying that because the overwhelming volume in New Jersey is out of state, there can't be heightened scrutiny, that can't be where you're going to go with it? No, sir. No, what I'm trying to show you is that's the standard. And how have other cases looked at this, and what evidence has made the grade and what evidence has not? For example, here I've indicated that, for example, in the Hunt case and in Exxon, they focused on this notion of substitution. In other words, has New Jersey wine, has a frustrated buyer in New Jersey, because they couldn't get an Oregon Pinot or a California Cab, said, okay, I'm going for the Cape May selection. I don't mean to be pejorative here, but those are the options, okay? There is no evidence there. And folks are laughing, but, you know, that's the kind of evidence that would have to be submitted here in order to meet the constitutional standard. As the court in Valdezzi said, speculation, conjecture, even, you know, wonderful advocacy by plaintiff's counsel doesn't do it. Let's look at what the Third Circuit has done in American Trucking, for example. The level of scrutiny to be applied to a statute that affects interstate commerce is contingent upon whether the court finds that statute discriminatory. Unfortunately, it's a little bit of a tautology here. However, we've got it drilled down. You would agree that if there's a discriminatory statute, then you get heightened scrutiny. If it's not, then it's pike balancing. That's really what you're arguing. And you're arguing that the record doesn't establish the discriminatory statute. The impact of that may well be because of the, and I think it is because of the plaintiffs, that backs us into standing. So it sounds like you're arguing that because of the interest represented by these plaintiffs, you cannot get to strict scrutiny because at the very most, if anything, the injury being alleged would only be pike balancing. I'm not sure you're right about that. Well, let's assume for the moment that there is standing for both the winery plaintiffs and the consumer plaintiffs. I'll just go that far. Let's assume they're here, there's an actual controversy, and there is theoretically a harm. They can't get the wine that they want. However, on the merits, which I realize bleeds in from redressability, you have to establish that on the merits the statute is in fact discriminatory. We're past standing now. They have to toe the line here and put up their proof because remember, I'm sorry, Your Honor. It's the plaintiff clearly that has that initial burden to show discrimination. And if they don't, then it doesn't get kicked over to less discriminatory alternatives. So we never get there. Suppose you cancel winery, which is apparently kicking and screaming to get out of this case. On the other hand, eager to stay in the case, and we would get a record that would show that, gosh, if it weren't for these curious structures in New Jersey, we would be in there selling. Then we would, apart from standing, we would also have a discrimination, would we not? Your Honor, let me speak to, if I may, let's put aside the sales room for a moment because the real nub here, notwithstanding the discussion this morning, really is the ability to direct ship. That's really the holy grail here. That's what they want. But you know what? I'm sure that the New Jersey wineries would love that as well. But nobody has it. That's all I want. Okay. But on that, Your Honor, at least with respect to that claim, there clearly not only is there no evidence of a discriminatory effect, I suppose the reason for that is because there is no discriminatory element in the statute because there is an across-the-board ban. So the difficulty here is, as my colleague, Mr. Lewin, referred to, let's assume for the moment that they somehow were able to get what they wanted. This court does not have the ability to do that because you're creating a right from whole cloth that doesn't exist. You're not leveling the playing field when it comes to direct shipping. Nobody can do it. So the court cannot take over a legislative function, and Judge McKee, this gets to your very opening remark, they can only go so far. If there were a disparity, yes. And if there were a disparity that was directly related to the across-the-board direct shipping ban, fine. But by definition, it's across-the-board. So nobody can do it. I'm sorry, Your Honor. I believe I understand that nobody can do direct selling, and I believe I understand that the plaintiffs are saying, but nonetheless this impinges on the plaintiffs and those that they can speak for. There is a discriminatory effect, and you challenge that, and indeed you say that that's the holy grail, I think, was your phrase of the focus of the plaintiff's case. I thought that was, if I may say so, the weakest part of the plaintiff's case, and so I'm not surprised that you challenge it. But I think you have to worry about the other parts of the plaintiff's case. Your Honor, you're referring to the plaintiff's case. Most plaintiffs will tell us that they're not interested in anything except direct sales. Well, let's speak to sales rooms then, Your Honor, and what's the evidence there? The evidence is that Mr. Hansel has no interest in having a sales room. That's what I said before, that's right. Yes, but it also goes to the evidence. It seems to me that you've had the right plaintiff. They had someone from Stag Leap that I keep coming back to in here saying, we want to set up six showrooms in Princeton, New Jersey, right around the campus maybe. But we're never going to set them up. We want to set up six showrooms because the only students in Princeton who can afford Stag Leap go to Princeton. They couldn't do it only because they're in Napa Valley and they're not in, what's the river in New Jersey? Is there a river in New Jersey? Raritan. They're not in the Raritan Valley. They're in the Napa Valley, so they can't do it. It seems that you get with the right plaintiff, you'd have that, and your attempt to get around that seems to me to back into the standing issue and say there's nobody here who wants to do that, and I think that's right, but that's because of the plaintiffs and their standing problems, not because of the lack of the discriminatory impact of the statute, at least insofar as the showroom provision of it goes. Your Honor is correct in terms of with respect to that particular license that Hansel would not be able to avail himself of that. I guess my two comments to that would be there are other licenses available to him. One would be the limited wholesale license, and the other would be. . . I thought I was talking about limited wholesale license. With a limited wholesale license you cannot sell directly to consumers. That is correct, Your Honor, but he could certainly get his product in here, and he could also. . . To a wholesaler. No, no, he could be his own wholesale. So he could sell to retailers. He could self-retail. Okay, I understand your argument. I don't want to cut you off, but I do want to try to get to what the plaintiffs have to say. Judge Pollack, would you like me to address the licensing fees? Apparently we discussed that the direct shipping was the weak link. Shall I discuss what I perceive to be equally weak links? That hasn't been discussed yet, Your Honor, and I don't mean to disregard the other claims, which I assume are troubling, Your Honor, in terms of how we would address those and the sufficiency. With respect to the licensing fee component, first of all, there's a problem insofar as Judge Hayden misunderstood what those licensing fees were, number one. And number two, she struck some licensing fees, quite frankly, that have absolutely nothing to do with the case at hand, and I'm sure the plaintiffs would agree with that. But with respect to the first prong, the issue of the validity of the amount of the licensing fee really gets us back to, well, it's apples and oranges, because they give very, very different benefits and privileges associated with each of those. And from New Jersey's perspective, and rightly so, the one that gives you the big basket of rights and privileges costs more. And this is no different than, for example, the case that we cited, Supreme Court case, the Ball case, which had to do with how are we going to set up who gets the benefits and the burdens associated with voting for water districts. And the Supreme Court said it makes perfect sense, and it's perfectly rational, for the state to determine that those landowners with the most at risk and, conversely, that bear the burdens but have the most privileges should have the greatest amount at stake and therefore have, if you will, higher voting rights. It's the same thing here, Your Honor. There's no discrimination because it's not, again, you don't have equal entities on each side of the balancing. So you're comparing apples and oranges. So in terms of Judge Hayden, I think the bottom line is she misunderstood what those licenses did and what they granted in terms of the basket of privileges, and it got her off on the wrong path in terms of why she didn't understand the difference in the dollar value of the fee. Your Honor, with respect to the personal accompaniment statute, again. I think we're pretty clear on that. Okay. I just wanted to, one thing, if I might, Your Honor. So we're not reading between the lines. What I'm trying to tell you is we get it. Okay. Let's try to hear what the plaintiffs have to say. Thank you, Your Honor. I appreciate the time. Okay. Thank you. Thank you. May it please the Court. You're ready, Judge McKee. I'm sorry. I'm sorry.  It looked like you might be writing. I was turning off my cell. May it please the Court. I'm James Hanford, and I represent the part of the appellees who are plaintiffs below and the ones who are challenging the constitutionality of the New Jersey wine laws that have both the purpose and effect of blocking access in various ways to the interstate market. Help us, as you can imagine, at least I and I think my colleagues also are, in wrestling with your client's standing. Help us out with that. How do we get to the merits here? Where's the standing? In terms of standing? He doesn't want to be here. The Freedmen's will only go into one store, the ShopRite, and can't find kosher wine there. And the Freedmen's will basically say they've had no trouble bringing wine back. We really are talking about the direct sales requirements, it seems to me. Let's say we start in standing. The starting premise in standing is this Court's previous decision in Oxford Associates in which this circuit said that potential buyers and sellers who wish to do interstate commerce and are prevented from doing so by state law have standing both meeting the Lou Gen test and interstate standing. But here, as simple footing, what the plaintiffs cannot do, New Jersey residents can't do. So how do you get to the Dormant Commerce Clause problem? If the issue is direct shipping, and it seems to me that's where we're going. If the issue is direct shipping, the basic facts are that there are 5,000 United States wineries producing more than 25,000 different wine labels. A wine bottle is three inches wide, which would mean a retailer would need more than one mile of shelf space to display all the wines produced in the United States. The only market for a couple thousand of wineries in the United States, including the New Jersey wineries, is by direct sales. Right, but nobody has that. Jersey residents don't get it? Where's the discriminatory impact under the Dormant Commerce Clause if everyone is being treated the same, even though they may be treated unfairly? If the state of New Jersey decides we're going to treat everybody terribly, we're going to make sure that nobody gets wine sent to the house, and we don't care whether they're Jersey folks or anybody else, you can't get wine sent to you. Where's the discrimination? Well, because the New Jersey, you can have a huge amount of discrimination. You can have some discrimination but less discrimination, and this falls into that category. The New Jersey wineries are allowed, of course, to sell directly to consumers, and the consumers can get the wine home. The combination of the absence of direct shipping and the personal transportation ban in conjunction means that, the example was of a New York winery, they cannot. They can go to that New York winery 10 miles across the border, buy the wine, and cannot legally bring it back if it's over five bottles. Frankly, if you're going to go to the expense and trouble of visiting a winery, you're going to buy more than five bottles. There's no enforcement of that, right? Well, we are told that, but we are told that by a kind of contrived statement that arises for the first time during litigation. There was no previous official statement. But under ROC, don't we have to defer to that declaration of the policy of the executive? And in fact, what's happened over there since Granholm would confirm what was put on the record, that it is not going to enforce things that are out there. Well, there are two things. First of all, of course, as the state has made clear, the Attorney General of New Jersey does not appear in this case. This is only the Alcoholic Beverage Commission. New Jersey law itself prohibits the New Jersey Alcoholic Beverage Commission or any agency from interpreting a statute passed by the legislature in ways that nullify the statute. So if the statute says it is illegal to bring it back, that's not a surprising statement to me, but I didn't know where the Attorney General said that. Legislation says that nobody but the Attorney General can interpret. I'm sorry, that was not the point I wanted to make. I'm not even – there is precedent, and I don't know if there is here, that the opinion of the Attorney General carries some weight as to the proper interpretation of state laws. The Attorney General in this case has not – is not a party, has to be dismissed from the party, and has not made any kind of official interpretation of this statute that is at issue. What do we then do with the Supreme Court's statements in Ward v. Brock against racism that we've got an explanation or a statement by an agency charged with implementing or enforcing a regulation or a statute as to how it will do that? That is something that is entitled to deference. Because it's not official in any way, it doesn't bind them. In other words, there are various ways that an agency can – But they're estoppel now, I think. They're bound now. I'm not sure about that. I don't think they have estoppel against the state, but I do not know the answer to that. But are we in a situation where permanent and binding assurance that there would be no enforcement would satisfy your claims? Yeah, I think the easiest way to do that would be in a consent decree in the district court. They had plenty of opportunities and didn't. I'm not – their argument is they want to leave an unconstitutional statute on the books because they're not going to enforce it. There's nothing official anywhere in the record. They themselves, in the record – and I've forgotten where it is – introduced a kind of official letter from the ABC about a previous statute that the ABC was announcing based on a Supreme Court decision that it felt it could no longer enforce. There's no such letter, no such statement on the website, nothing that the agency has done other than speak through an attorney in the course of litigation that says, oh, by the way, we don't enforce this. There is a formal certification, is there not, with respect to the reciprocity issue? Not that I'm aware of. There is – in other words, there is a statement made for purposes of this litigation drafted by the attorney about the reciprocity issue. But again, it does not – it was not done in any kind of official context through the – whatever procedures the agency follows under the Administrative Procedures Act. I guess I thought it had been a certification or a letter of Mr. Fisher. I think that that has been put forward as if there were an official statement, but I believe that there's not that I am aware of. Ms. Tavon is for the State Chair's rebuttal. If there is some official statement that I do not know about, then still, I don't – if they're officially conceding that this is not enforceable, I don't understand why it would be left on the record. I think it would – if it's – Better to take it off the books. I think it's better to take it off the books because the next, you know, the next director of the ABC and the director after him may have a different view and may change their mind unless there's something official. I want to take you back to standing for a minute if I could, Mr. Tanford. The district court, as I read the opinion, said, well, some of these plaintiffs have standing to raise some claims and I don't need to get into who has what, right? That's correct. That was wrong, right? Yes and no. Somebody needs to have standing to raise the claims that plaintiffs are claiming, but everybody doesn't need standing. Do you teach civil procedure or federal courts at Indiana? I'm potentially embarrassed to say I teach advanced civil procedure. Now you're on the hot spot. I teach it only as a practical question. Isn't it axiomatic that standing is a jurisdictional question and the trial court needs to ascertain which plaintiffs have standing to raise exactly which claims and to do so in a very perspicacious fashion, claim by claim, party by party. Isn't that the task? Yes, but once it finds, it is my understanding of the law, that once it finds that one party has standing to raise an issue, it need not also analyze whether other parties have standing to raise that same issue because it wouldn't matter. There is then an Article III case in controversy established. Well, wait a minute. I mean, with three plaintiffs in this case, if Hansel Winery has standing to challenge the direct shipping ban, but the other two parties don't have standing to challenge anything, then the district court should have dismissed the other two parties. Yes, they could have. All right. So I want to just try to nail down exactly what we're dealing with here because there were a lot of claims, and I know there was an intervening Supreme Court case. There was an intervening amendment to the statute. Let's assume for a minute that Hansel has standing to challenge the direct shipping ban because Hansel says, I want to ship directly to New Jersey consumers. Yes. And let's assume that the Freedmen's have standing to challenge the direct shipping ban because the Freedmen's testified, we want the opportunity to buy directly over the phone or the Internet, right? Right. The Freedmen's, how do the Freedmen's have any standing to raise any claim? The Freedmen's say that they have been denied that they would like to buy, to make two kinds of purchases that would involve direct shipping. One is to be able to purchase kosher wines that they cannot find at their local retail stores, and the second one is that they would like to be able to occasionally send wine as gifts to other people, which that seems their wine gift basket, things available all over. So they also have alleged that they have attempted to and been unable to engage in an act of interstate commerce. Okay. Now, what else, other than direct shipping, what standing do any of the three parties have? Start with Hansel, please. Well, the NUGEN standing requires, of course, injury causation and regressibility. I assume we're talking mostly about injury here. Hansel says that 19% of his business is by direct sales and shipping to consumers. He says that he has New Jersey customers but cannot. Well, we've stipulated that. Other than direct shipping, what does Hansel have standing to challenge? He has standing to challenge the residency requirement for obtaining a farm winery license. I thought he didn't have any interest in establishing a farm winery in New Jersey. That's what he said. Even in California where he is, he doesn't know. No, no, a farm winery license gives him several different privileges, not just the privilege. Well, not in the abstract. Where in the record did Hansel say he wants or has he ever tried to apply or wishes to apply for a farm winery license? He certainly says he has not applied because it says it's limited to people using New Jersey. The reality of being disingenuous, I thought, and correct me if I'm wrong, but he said, look, he has trouble now selling all the wine he has. He has no trouble selling all the wine he has. I'm sorry. He ended up with some kind of a dispute with getting wine into New Jersey, so he worked it out so that two different entities in New Jersey wanted to sell his wine, divided things territorially, but he has no desire to do anything other in terms of getting wine in New Jersey than what he is doing now. Am I wrong about that? Well, those, first of all, the little, the portion that the defendants have focused on were statements he made in the course of a deposition after four years of litigation in which he had frankly gotten sort of frustrated with the whole process. He had previously submitted other evidence, including an affidavit. Well, he moved to withdraw. It wasn't that of the case. He did move to withdraw, and the reason he moved to withdraw was because of expense. And his whole point, part of the point on the discriminatory effect of the direct shipping ban is all of these various things that New Jersey says are alternatives to getting their wine to market are more expensive, and they are too expensive for a small winery. And the reason that Hansel bailed out… Now, is this your interpretation of what he's done, or is this what he has said? No, he has said at 376 in the Joint Appendix, for example, I cannot afford it. So he has talked about cost a number of times. He said the reason… Doesn't he have a right to get out of his own case? He's the plaintiff. It's not like the defendants say get me out of this. You would have thought so, but the defendants objected, and the judge wouldn't let him out. We made the, we're the ones that made the motion. So you're fine if he goes, if Hansel? You don't have any objection to us dismissing Hansel? Obviously, since then he's changed his mind. Well, now he wants to back in. But he is in. He was never let out. But I'm saying his view now is I want to stay in. I recant my prior request to escape this litigation. He has not. There's no factual record of that because there were no subsequent depositions. But as an attorney, I could not be here ethically arguing on his behalf. If he had fired, he had not fired me. He has not taken any step. He has not taken any step to remove me from the case or to say I'm not going to do it anymore. But are we dealing with, so we're dealing with more than the direct shipping ban here? Absolutely. I don't know if you're pointing me to the record where my understanding is that Hansel does not want to open a storefront, that Hansel doesn't want a plenary license or a farm license. Where in the record can you show me that Hansel has said he wants any of those three things? Specifically as you phrased it? No. He has the one thing, right now he uses a wholesale. I'm not asking what he uses or doesn't use or what he might take advantage of. Where in the record do we have any record evidence to show that Hansel has suffered an injury, in fact, beyond the direct shipment issue? He says he has customers in New Jersey and could sell to them saving the cost of a wholesaler. If he got a farm winery license, he can, like New Jersey wines, at a minimum, bypass the wholesaler and sell directly to retailers. He could distribute his own wine to retailers and make it available. This was, in the Baldacci case cited by them, one of the reasons that the First Circuit held that its ban on direct shipping was lawful was because out-of-state wineries had the right to bypass the wholesaler and negotiate directly with a couple of ordinary retailers to sell their product. That doesn't cost them anything. To open their own separate facility, be it a wholesaling business or a retail salesman, that costs them money. Hansel's point is he wants to be able to do this without it costing him a lot of money because he doesn't have very many New Jersey customers that would justify expense. And what would he need to do to get the farm winery license? This court would simply have to strike the word New Jersey. No, I mean under New Jersey law, what would he have to do? Under New Jersey law, he would have to apply, and then the fee for the license would depend on his production volume. It goes up from $63 to $9,800 or something, depending on the size. Well, I thought right now he can't get one because it's out-of-state, can he? That's right. He can't get one unless this court were to strike down the – Right. The only reason he can't get one is because of the residency requirement. And so he cannot do business in any way. Without that license, people can't even – Well, he can do business the way the other 99% do, which is through the three-tier system. But he wants to do business the way New Jersey wineries get to. That's the discrimination. They get to bypass the wholesaler, and he does not. Well, he wants more than that. He wants to deal directly, and New Jersey wineries can't do that either. Well, he wants to ship directly. Ship directly. Okay. You can ask – this is litigation. You can sometimes ask for the ideal remedy that doesn't mean you wouldn't settle for half a loaf. And we do think, though, that if it comes down to the question, to really treat people the same and in the same effect is that they have – each winery has to have some way of getting the wine to the dinner table of its customer. And the problem is that several – that the out-of-state wineries with small volume, those that are similarly situated to New Jersey wineries, they're not producing the best wine in the world. They don't have lots of customers. They don't have big wholesale contracts. They want – the only realistic way that they can get their wine directly to a customer in New Jersey is by direct shipping. This market exists. Thousands of wineries use it. Thirty-two states allow direct shipping because that's the nature of the market today. The direct shipping thing, it seems to me that you just – you made a good argument earlier that it's not the direct shipping per se, but the direct shipping combined with other licensing aspects that is evil here. But you're saying you're focusing on direct shipping. Again, that just seems to me to be a slam-dunk loser for you. It is a type, right? That's wild. I don't know that that means any of us would say it's a bad idea, but it's a threat. It's a direct challenge to the three-tier system, which the Supreme Court upheld in Granholm. Except that they have already exempted farm winery license holders from the three-tier system. Well, that's where you're – I think that's what Judge – I can't speak for Judge McKee. You're saying that's your better argument. Where are they treating the outsiders differently than the insiders? They are treating outsiders differently than the insiders by not letting them have the rights associated with one of these winery licenses. And primarily, that is the right to sell directly to consumers without paying the wholesaler's market. Secondly, it is the right to distribute one's own wine directly to retailers, again, without paying the wholesaler's market. And you have a great argument on the sixth on-premises.